NIELSEN MERKSAMER
  PARRINELLO GROSS & LEONI LLP
MARGUERITE MARY LEONI (SBN 101696)
CHRISTOPHER E. SKINNELL (SBN 227093)
2350 Kerner Boulevard, Suite 250
San Rafael, California 94901
TELEPHONE: (415) 389-6800
FACSIMILE:  (415) 388-6874
Email: mleoni@nmgovlaw.com
Email: cskinnell@nmgovlaw.com

*Attorneys for Intervener-Defendants*
INDEPENDENT VOTER PROJECT,
CALIFORNIANS TO DEFEND THE OPEN
PRIMARY, ABEL MALDONADO AND
DAVID TAKASHIMA

FILED
CLERK, U.S. DISTRICT COURT

JUL – 6 2012

CENTRAL DISTRICT OF CALIFORNIA
BY        DEPUTY

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELISE BROWN,<br><br>     *Plaintiff,*<br><br>vs.<br><br>DEBRA BOWEN, in her official capacity as California Secretary of State,<br><br>     *Defendant.* | Case No.: 12-cv-05547-PA-SPx<br><br>**INTERVENERS' REQUEST FOR JUDICIAL NOTICE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>JUDGE: Hon. Percy Anderson<br>COURTROOM: 163<br>HEARING DATE: TBA<br>HEARING TIME: TBA |
| INDEPENDENT VOTER PROJECT, CALIFORNIANS TO DEFEND THE OPEN PRIMARY, ABEL MALDONADO AND DAVID TAKASHIMA,<br><br>     *Intervener-Defendants.* | BY FAX |

RECEIVED
BUT
NOT FILED

JUL – 6 2012

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT CALIFORNIA

Pursuant to Rule 201 of the Federal Rules of Evidence, Interveners respectfully request that the Court take judicial notice of the following documentary evidence:

1. Exhibit B: The pages from the Voter Information Guide, published by the California Secretary of State in connection with the June 8, 2010, Statewide Primary Election, that are related to Proposition 14, including the text of the measure.

2. Exhibit C: An August 20, 2009, order in *Wash. State Republican Party v. Wash. State Grange*, Case No. 05-cv-00927-JCC (W.D. Wash.) (granting in part and denying in part defendants' motions to dismiss).

3. Exhibit D: the election results of the June 5, 2012 primary in Congressional District 8, published on the California Secretary of State's website.

This request is supported by the Declaration of Christopher Skinnell, attached hereto as Exhibit A.

## JUDICIAL NOTICE OF THESE DOCUMENTS IS APPROPRIATE
## UNDER FEDERAL RULE OF EVIDENCE 201

Regarding the Voter Information Guide materials in Exhibit B, a district court may take judicial notice pursuant to Rule 201 of the Federal Rules of Evidence of the records and reports of administrative bodies. *United States v. 14.02 Acres*, 547 F.3d 943, 955 (9th Cir. 2008); *Interstate Nat'l Gas Co. v. So. Cal. Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953). "This includes public records and government documents available from reliable sources on the Internet." *United States ex rel. Dingle v. BioPort Corp.*, 270 F. Supp. 2d 968, 972 (W.D. Mich. 2003). *See also Paralyzed Veterans of Am. v. McPherson*, 2008 U.S. Dist. LEXIS 69542, *17 (N.D. Cal. Sept. 9, 2008) ("'It is not uncommon for courts to take judicial notice of factual information found on the world wide web.' *O'Toole v. Northrop Grumman*

*Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007). This is particularly true of information on government agency websites, which have often been treated as proper subjects for judicial notice." (citing cases, and taking judicial notice of California Secretary of State's approval of Marin County's voting machines)); *In re Charles Schwab Corp. Secs. Litig.*, 257 F.R.D. 534 , 561 n.18 (N.D. Cal. 2009) (taking judicial notice of FASB Statement of Financial Accounting Concept).

With respect to all of the foregoing documents, "[f]ederal courts consider records from government websites to be self-authenticating under Rule 902(5)." *Paralyzed Veterans of Am.*, 2008 U.S. Dist. LEXIS 69542 at *22 . Moreover, "[a] trial court may presume that public records are authentic and trustworthy. The burden of establishing otherwise falls on the opponent of the evidence, who must come 'forward with enough negative factors to persuade a court that a report should not be admitted.'" *Gilbrook v. City of Westminster,* 177 F.3d 839, 858 (9th Cir. 1999) (quoting *Johnson v. City of Pleasanton,* 982 F.2d 350, 352 (9th Cir. 1992)). Nevertheless, the authenticity of these documents is further corroborated by the Declaration of Christopher Skinnell, attached hereto as Exhibit A.

Regarding the district court opinion in Exhibit C, Federal Rule of Evidence 201 permits courts to take judicial notice of complaints and other papers filed in separate actions. *See Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of complaint from other proceedings); *Phelps v. Provident Life & Acc. Ins. Co.*, 60 F. Supp. 2d 1014, 1017-18 (C.D. Cal. 1999) (taking judicial notice of unpublished opinion attached to defendant's summary judgment motion).

Regarding the election results in Exhibit D, judicial notice of election results posted on a government website is appropriate under Federal Rule of Evidence 201(b)(2). *Martinez v. Bush*, 234 F. Supp. 2d 1275, 1307 n.36 (S.D.

Fla. 2002) (taking judicial notice of elections results from the Florida Department of State website); *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 454 n.174 (S.D.N.Y.) (three-judge court), *summarily aff'd*, 543 U.S. 997 (2004) (taking judicial notice of results posted on N.Y. State Bd. of Elections website). *See also Romero v. City of Pomona*, 883 F.2d 1418, 1420 n.1 (9th Cir. 1987) ("we may take judicial notice of the results of these elections, contained in the reports of a public body, Fed.R.Evid. 203(b)(2)[.]"), *overruled in part on other grounds, Townsend v. Holman Consulting Corp.*, 914 F.2d 1136 (9th Cir. 1990) (en banc).

For the foregoing reasons, Interveners hereby respectfully ask that the Court take judicial notice of the above-listed documentary evidence.

Dated: July 6, 2012                    NIELSEN MERKSAMER
                                       PARRINELLO GROSS & LEONI LLP

                                       By:/s/        Marguerite Mary Leoni        .
                                              Marguerite Mary Leoni

                                       By:/s/        Christopher E. Skinnell        .
                                              Christopher E. Skinnell

                                       *Attorneys for Intervener-Defendants*
                                       INDEPENDENT VOTER PROJECT,
                                       CALIFORNIANS TO DEFEND THE
                                       OPEN PRIMARY, ABEL MALDONADO
                                       AND DAVID TAKASHIMA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **EXHIBIT A**

**EXHIBIT A**

**DECLARATION OF CHRISTOPHER E. SKINNELL**
**IN SUPPORT OF REQUEST FOR JUDICIAL NOTICE**

I, CHRISTOPHER SKINNELL, hereby declare under penalty of perjury as follows:

1.     I am over 18 years of age and make this declaration of my own personal knowledge.

2.     I am one of the attorneys for Proposed Interveners in this action, CALIFORNIA INDEPENDENT VOTER PROJECT, DAVID TAKASHIMA, ABEL MALDONADO & CALIFORNIANS TO DEFEND THE OPEN PRIMARY.

3.     On January 24, 2012, I visited the California Secretary of State's website, www.sos.ca.gov, where I downloaded the pages from the Voter Information Guide, published by the Secretary of State in connection with the June 8, 2010, Statewide Primary Election, that are related to Proposition 14, including the text of the measure.  True and correct copies of these materials are attached to Interveners' Request for Judicial Notice, filed herewith, as Exhibit B.

4.     On or about January 24, 2012, I visited the electronic filing website for the United States District Court for the Western District of Washington, where I reviewed and downloaded an August 20, 2009, order in *Wash. State Republican Party v. Wash. State Grange*, Case No. 05-cv-00927-JCC (W.D. Wash.) (granting in part and denying in part defendants' motions to dismiss).  A true and correct copy of that order attached to Interveners' Request for Judicial Notice, filed herewith, as Exhibit C.

5.     On July 6, 2012, I visited the California Secretary of State's website, where I reviewed and printed the election results of the June 5, 2012 primary in Congressional District 8.  A true and correct copy of those results is attached to Interveners' Request for Judicial Notice, filed herewith, as

Exhibit D.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct of my own personal knowledge except for those matters stated on information and belief and, as to those matters, I believe them to be true.  If called as a witness, I could competently testify thereto.

Executed on July 6, 2012, at San Rafael, California.

/s/ Christopher E. Skinnell
CHRISTOPHER SKINNELL

INTERVENERS' REQUEST FOR JUDICIAL NOTICE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

CASE NO. 2:12-cv-05547-PA-SPx
**EXHIBIT A**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **EXHIBIT B**

INTERVENERS' REQUEST FOR JUDICIAL NOTICE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

CASE NO.  2:12-cv-05547-PA-SPx
**EXHIBIT B**

PROPOSITION

# 14

## ELECTIONS.  INCREASES RIGHT TO PARTICIPATE IN PRIMARY ELECTIONS.

---

OFFICIAL TITLE AND SUMMARY · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · PREPARED BY THE ATTORNEY GENERAL

---

### ELECTIONS.  INCREASES RIGHT TO PARTICIPATE IN PRIMARY ELECTIONS.

- Encourages increased participation in elections for congressional, legislative, and statewide offices by changing the procedure by which candidates are selected in primary elections.
- Gives voters increased options in the primary by allowing all voters to choose any candidate regardless of the candidate's or voter's political party preference.
- Provides that candidates may choose not to have a political party preference indicated on the primary ballot.
- Provides that only the two candidates receiving the greatest number of votes in the primary will appear on the general election ballot regardless of party preference.
- Does not change primary elections for President, party committee offices and nonpartisan offices.

### Summary of Legislative Analyst's Estimate of Net State and Local Government Fiscal Impact:

- No significant net change in state and local government costs to administer elections.

---

#### FINAL VOTES CAST BY THE LEGISLATURE ON SCA 4 (PROPOSITION 14)
#### (Resolution Chapter 2, Statutes of 2009)

| Senate: | Ayes 27 | Noes 12 |
|---------|---------|---------|
| Assembly: | Ayes 54 | Noes 20 |

---

## ANALYSIS BY THE LEGISLATIVE ANALYST

### BACKGROUND

***Primary and General Elections.*** California generally holds two statewide elections in even-numbered years to elect candidates to state and federal offices—a primary election (in June) and a general election (in November). These elections (such as those for Governor and Members of Congress) are partisan, which means that most candidates are associated with a political party. For these partisan offices, the results of a primary election determine each party's nominee for the office. The candidate receiving the most votes in a party primary election is that party's nominee for the general election. In the general election, voters choose among all of the parties' nominees, as well as any independent candidates. (Independent candidates—those not associated with a party—do not participate in primary elections.) The winner of the general election then serves a term in that office.

***Ballot Materials Under Current Primary System.*** For every primary election, each county prepares a ballot and related materials for each political party. Those voters affiliated with political parties receive their party's ballot. These party ballots include partisan offices, nonpartisan offices, and propositions. Voters with no party affiliation receive ballots related only to nonpartisan offices and propositions. Parties, however, may allow voters with no party affiliation to receive their party's ballot.

**PROP**
# 14

**ELECTIONS. INCREASES RIGHT TO PARTICIPATE IN PRIMARY ELECTIONS.**

---

**ANALYSIS BY THE LEGISLATIVE ANALYST**                                                      **CONTINUED**

*Partisan Statewide Elections in California.* Partisan elections for state office include those for the Governor, Lieutenant Governor, Controller, Secretary of State, Treasurer, Insurance Commissioner, Attorney General, the 120 members of the Legislature, and four members of the State Board of Equalization. (The Superintendent of Public Instruction is a nonpartisan state office.) Partisan elections also are held for federal offices including President, Vice President, and Members of Congress.

## PROPOSAL

This measure, which amends the State Constitution, changes the election process for most state and federal offices. Its provisions and related legislation would take effect for elections after January 1, 2011.

*Creates a Top-Two Primary Election.* This measure creates a single ballot for primary elections for those congressional and state elective offices shown in Figure 1. Candidates would indicate for the ballot either their political party (the party chosen on their voter registration) or no party preference. All candidates would be listed—including independent candidates, who now would appear on the primary ballot. Each voter would cast his or her vote using this single primary ballot. A voter registered with the Republican Party, for example, would be able to vote in the primary election for a candidate registered as a Democrat, a candidate registered as a Republican, or any other candidate. The two candidates with the highest number of votes in the primary election—regardless of their party preference—would advance to compete in the general election. In fact, the two candidates in the general election could have the same party preference.

---

**Figure 1**
**Offices Affected by Proposition 14**

**Statewide Officials**
Governor
Lieutenant Governor
Secretary of State
Treasurer
Controller
Insurance Commissioner
Attorney General

**Other State Officials**
State Senators
State Assembly Members
State Board of Equalization Members

**Congressional Officials**
United States Senators
Members of the U.S. House of Representatives

---

*For text of Proposition 14, see page 65.*                                          *Analysis* | 15

**PROP**
# 14
ELECTIONS. INCREASES RIGHT TO
PARTICIPATE IN PRIMARY ELECTIONS.

---

**ANALYSIS BY THE LEGISLATIVE ANALYST**                                          CONTINUED

Figure 2 illustrates how a ballot for an office might appear if voters approve this measure and shows how this is different from the current system.



**Figure 2**

**Example of How Ballots Would Change if Voters Approve Proposition 14**

PROP **14** ELECTIONS. INCREASES RIGHT TO PARTICIPATE IN PRIMARY ELECTIONS.

---

**ANALYSIS BY THE LEGISLATIVE ANALYST** CONTINUED

*Does Not Affect Presidential Elections and Political Party Leadership Positions.* Under this measure, there would still be partisan primary elections for presidential candidates and political party offices (including party central committees, party officials, and presidential delegates).

## FISCAL EFFECTS

*Minor Costs and Savings.* This measure would change how elections officials prepare, print, and mail ballot materials. In some cases, these changes could increase these state and county costs. For instance, under this measure, all candidates—regardless of their party preference—would be listed on each primary election ballot. This would make these ballots longer. In other cases, the measure would reduce election costs. For example, by eliminating in some instances the need to prepare different primary ballots for each political party, counties sometimes would realize savings. For general election ballots, the measure would reduce the number of candidates (by only having the two candidates who received the most votes from the primary election on the ballot). This would make these ballots shorter. The direct costs and savings resulting from this measure would be relatively minor and would tend to offset each other. Accordingly, we estimate that the measure's fiscal effects would not be significant for state and local governments.

*Indirect Fiscal Effects Impossible to Estimate.* In some cases, this measure would result in different individuals being elected to offices than under current law. Different officeholders would make different decisions about state and local government spending and revenues. These indirect fiscal effects of the measure are unknown and impossible to estimate.

*For text of Proposition 14, see page 65.*

PROP
**14**
ELECTIONS. INCREASES RIGHT TO
PARTICIPATE IN PRIMARY ELECTIONS.

## ★ ARGUMENT IN FAVOR OF PROPOSITION 14 ★

Our economy is in crisis.

Unemployment in California is over 12%.

The Legislature, whose members were all elected under the current rules, repeatedly fails to pass the state budget on time, or close the state's gaping $20+ billion fiscal deficit.

Our state government is broken.

But the politicians would rather stick to their rigid partisan positions and appease the special interests than work together to solve California's problems.

In order to change government we need to change the kind of people we send to the Capitol to represent us.

IT'S TIME TO END THE BICKERING AND GRIDLOCK AND FIX THE SYSTEM

The politicians won't do it, but Proposition 14 will.

• Proposition 14 will open up primary elections. You will be able to vote for any candidate you wish for state and congressional offices, regardless of political party preference. It will reduce the gridlock by electing the best candidates.

• Proposition 14 will give independent voters an equal voice in primary elections.

• Proposition 14 will help elect more practical office-holders who are more open to compromise.

"The best part of the open primary is that it would lessen the influence of the major parties, which are now under control of the special interests." (*Fresno Bee*, 2/22/09.)

PARTISANSHIP IS RUNNING OUR STATE INTO THE GROUND

Non-partisan measures like Proposition 14 will push our elected officials to begin working together for the common good.

Join AARP, the California Alliance for Jobs, the California Chamber of Commerce and many Democrats, Republicans, and independent voters who want to fix our broken government. Vote YES on Proposition 14.

Vote Yes on 14—for elected representatives who are LESS PARTISAN and MORE PRACTICAL.

*www.YESON14OPENPRIMARY.com*

**JEANNINE ENGLISH,** AARP
California State President
**JAMES EARP,** Executive Director
California Alliance for Jobs
**ALLAN ZAREMBERG,** President
California Chamber of Commerce

## ★ REBUTTAL TO ARGUMENT IN FAVOR OF PROPOSITION 14 ★

Politicians wrote Proposition 14 to change the law so they can conceal their party affiliation on the election ballot. Voters won't know whether they are choosing a Democrat, Republican, Libertarian, or Green Party candidate.

The proponents claim their measure will stop partisan politics. But how is allowing politicians to hide their party affiliation going to fix partisanship? Proposition 14 is politicians trying to trick voters into thinking they are "independent."

What the proponents don't tell you is that special interests are raising hundreds of thousands of dollars to pass Proposition 14, including money from health insurance corporations, developers and financial institutions, because Proposition 14 will make it easier for them to elect candidates they "choose." But you won't know which political party the candidate belongs to.

Proposition 14 will decrease voter choice. It prohibits write-in candidates in general elections. Only the top two vote getters advance to the general election regardless of political party. Special interests with money will have the advantage in electing candidates they support.

Currently, only two states use "top-two" elections. In 2008, Washington State had 139 races and only ONE incumbent lost a primary. Proposition 14 will protect incumbents.

California Nurses, Firefighters and Teachers have joined with groups like the Howard Jarvis Taxpayers Association to oppose Proposition 14. These organizations don't usually agree on political issues. But this time they do.

Candidates who ask for your vote shouldn't be allowed to conceal their political party.

Stop the special interest tricks. No on Proposition 14.

**ED COSTANTINI,** Professor Emeritus of Political Science
University of California, Davis
**NANCY J. BRASMER,** President
California Alliance of Retired Americans
**STEVE CHESSIN,** President
Californians for Electoral Reform

*Arguments printed on this page are the opinions of the authors and have not been checked for accuracy by any official agency.*

**PROP**
# 14
ELECTIONS. INCREASES RIGHT TO PARTICIPATE IN PRIMARY ELECTIONS.

## ★ ARGUMENT AGAINST PROPOSITION 14 ★

Proposition 14 was written in the middle of the night and put on the ballot by a couple of politicians and Arnold Schwarzenegger. They added their own self-serving little twist.

They call it an "open primary" but CANDIDATES WILL BE ALLOWED TO CONCEAL THEIR PARTY AFFILIATION FROM VOTERS. The current requirement that candidates list their party on the ballot is abolished.

Proposition 14 will also decrease voter choice and make elections more expensive:

• The general election will not allow write-in candidates.

• Elections will cost more money at a time when necessary services like firefighters, police and education are being cut. County election officials predict an increased cost of 30 percent.

• Voter choice will be reduced because the top two vote getters advance to the general election regardless of political party.

• This means voters may be forced to choose between two candidates from the same political party. Democrats could be forced to choose between two Republicans, or not vote at all. Republicans could be forced to choose between two Democrats, or not vote at all.

• Independent and smaller political parties like Greens and Libertarians will be forced off the ballot, further reducing choice.

Can't politicians ever do anything without scheming something that's in their self-interest?

Here's the zinger they stuck in Proposition 14 . . .

"Open Candidate Disclosure. At the time they file to run for public office, all candidates shall have the choice to declare a party preference. The names of candidates who choose not to declare a party preference shall be accompanied by the designation 'No Party Preference' on both the primary and general election ballots."

Very clever! They're making it look like they are "independents" while actually remaining in their political party. *Business as usual disguised as "reform."*

POLITICIANS ARE CHANGING THE LEGAL REQUIREMENT THAT MAKES THEM DISCLOSE THEIR POLITICAL PARTY.

Democrats will end up voting for Republican imposters. Republicans will end up voting for Democratic imposters.

Will you be voting for a member of the Peace and Freedom Party? The Green Party? The Libertarian Party? You won't really know.

Special interest groups will pump money into trick candidates . . . imposters with hidden agendas we can't see.

Currently, when a rogue candidate captures a nomination, voters have the ability to write-in the candidate of their choice in the general election. But a hidden provision PROHIBITS WRITE-IN VOTES from being counted in general elections if Prop. 14 passes.

That means if one of the "top two" primary winners is convicted of a crime or discovered to be a member of an extremist group, voters are out of luck because Prop. 14 ends write-in voting.

Firefighters have joined with teachers, nurses and the Howard Jarvis Taxpayers Association opposing this initiative.

"The politicians behind Prop. 14 want to raise taxes without being held accountable. Vote NO."— Jon Coupal, President Howard Jarvis Taxpayers Association

We need "Open Primaries" to be "Open." That means full disclosure on the ballot and no tricks. No on Proposition 14.

**KEVIN R. NIDA,** President
California State Firefighters' Association
**ALLAN CLARK,** President
California School Employees Association
**KATHY J. SACKMAN, RN,** President
United Nurses Associations of California /
Union of Health Care Professionals

## ★ REBUTTAL TO ARGUMENT AGAINST PROPOSITION 14 ★

Proposition 14 is supported by people like you who are sick of the mess in Sacramento and Washington D.C. and want to do something about it.

The opponents of Proposition 14 are primarily special interests who helped create this mess and benefit from the way things are.

Their claims are deceptive and absurd.

FACT: If Proposition 14 passes, every candidate's party registration for the past decade will be posted publicly. This means no candidate will be able to mislead voters about their party registration history. And it's more disclosure than is required of candidates today.

FACT: Proposition 14 will have no significant financial impacts whatsoever.

Why do opponents of reform make these false charges? Because they benefit from a system that is broken.

Vote yes on 14 to:

• Reduce gridlock by electing the best candidates to state office and Congress, regardless of political party;

• Give independent voters an equal voice in primary elections; and

• Elect more practical individuals who can work together for the common good.

Vote Yes on 14. We've had enough.
*www.YESON14OPENPRIMARY.com*

**JEANNINE ENGLISH,** AARP
California State President
**CARL GUARDINO,** President
Silicon Valley Leadership Group
**ALLAN ZAREMBERG,** President
California Chamber of Commerce

shall not be bound by the findings of the lead governmental agency in determining whether the presumption has been overcome.

(4) This subdivision applies only to replacement property that is acquired or constructed on or after January 1, 1995, and to property repairs performed on or after that date.

(j) Unless specifically provided otherwise, amendments to this section adopted prior to November 1, 1988, ~~shall be~~ *are* effective for changes in ownership that occur, and new construction that is completed, after the effective date of the amendment. Unless specifically provided otherwise, amendments to this section adopted after November 1, 1988, ~~shall be~~ *are* effective for changes in ownership that occur, and new construction that is completed, on or after the effective date of the amendment.

## PROPOSITION 14

This amendment proposed by Senate Constitutional Amendment 4 of the 2009–2010 Regular Session (Resolution Chapter 2, Statutes of 2009) expressly amends the California Constitution by amending sections thereof; therefore, existing provisions proposed to be deleted are printed in ~~strikeout type~~ and new provisions proposed to be added are printed in *italic type* to indicate that they are new.

### PROPOSED LAW

First—This measure shall be known and may be cited as the "Top Two Candidates Open Primary Act."

Second—The People of the State of California hereby find and declare all of the following:

(a) Purpose. The Top Two Candidates Open Primary Act is hereby adopted by the People of California to protect and preserve the right of every Californian to vote for the candidate of his or her choice. This act, along with legislation already enacted by the Legislature to implement this act, are intended to implement an open primary system in California as set forth below.

(b) Top Two Candidate Open Primary. All registered voters otherwise qualified to vote shall be guaranteed the unrestricted right to vote for the candidate of their choice in all state and congressional elections. All candidates for a given state or congressional office shall be listed on a single primary ballot. The top two candidates, as determined by the voters in an open primary, shall advance to a general election in which the winner shall be the candidate receiving the greatest number of votes cast in an open general election.

(c) Open Voter Registration. At the time they register, all voters shall have the freedom to choose whether or not to disclose their party preference. No voter shall be denied the right to vote for the candidate of his or her choice in either a primary or a general election for statewide constitutional office, the State Legislature, or the Congress of the United States based upon his or her disclosure or nondisclosure of party preference. Existing voter registrations, which specify a political party affiliation, shall be deemed to have disclosed that party as the voter's political party preference unless a new affidavit of registration is filed.

(d) Open Candidate Disclosure. At the time they file to run for public office, all candidates shall have the choice to declare a party preference. The preference chosen shall accompany the candidate's name on both the primary and general election ballots. The names of candidates who choose not to declare a party preference shall be accompanied by the designation "No Party Preference" on both the primary and general election ballots. Selection of a party preference by a candidate for state or congressional office shall not constitute or imply endorsement of the candidate by the party designated, and no candidate for that office shall be deemed the official candidate of any party by virtue of his or her selection in the primary.

(e) Freedom of Political Parties. Nothing in this act shall restrict the right of individuals to join or organize into political parties or in any way restrict the right of private association of political parties. Nothing in this measure shall restrict the parties' right to contribute to, endorse, or otherwise support a candidate for state elective or congressional office. Political parties may establish such procedures as they see fit to endorse or support candidates or otherwise participate in all elections, and they may informally "nominate" candidates for election to voter-nominated offices at a party convention or by whatever lawful mechanism they so choose, other than at state-conducted primary elections. Political parties may also adopt such rules as they see fit for the selection of party officials (including central committee members, presidential electors, and party officers). This may include restricting participation in elections for party officials to those who disclose a party preference for that party at the time of registration.

(f) Presidential Primaries. This act makes no change in current law as it relates to presidential primaries. This act conforms to the ruling of the United States Supreme Court in Washington State Grange v. Washington State Republican Party (2008) 128 S.Ct. 1184. Each political party retains the right either to close its presidential primaries to those voters who disclose their party preference for that party at the time of registration or to open its presidential primary to include those voters who register without disclosing a political party preference.

Third—That Section 5 of Article II thereof is amended to read:

SEC. 5.   (a)  *A voter-nomination primary election shall be conducted to select the candidates for congressional and state elective offices in California. All voters may vote at a voter-nominated primary election for any candidate for congressional and state elective office without regard to the political party preference disclosed by the candidate or the voter, provided that the voter is otherwise qualified to vote for candidates for the office in question. The*

candidates who are the top two vote-getters at a voter-nominated primary election for a congressional or state elective office shall, regardless of party preference, compete in the ensuing general election.

(b) Except as otherwise provided by Section 6, a candidate for a congressional or state elective office may have his or her political party preference, or lack of political party preference, indicated upon the ballot for the office in the manner provided by statute. A political party or party central committee shall not nominate a candidate for any congressional or state elective office at the voter-nominated primary. This subdivision shall not be interpreted to prohibit a political party or party central committee from endorsing, supporting, or opposing any candidate for a congressional or state elective office. A political party or party central committee shall not have the right to have its preferred candidate participate in the general election for a voter-nominated elective office other than a candidate who is one of the two highest vote-getters at the primary election, as provided in subdivision (a).

(c) The Legislature shall provide for ~~primary~~ partisan elections for ~~partisan offices~~ presidential candidates, and political party and party central committees, including an open presidential primary whereby the candidates on the ballot are those found by the Secretary of State to be recognized candidates throughout the nation or throughout California for the office of President of the United States, and those whose names are placed on the ballot by petition, but excluding any candidate who has withdrawn by filing an affidavit of noncandidacy.

~~(b)~~

(d) A political party that participated in a primary election for a partisan office pursuant to subdivision (c) has the right to participate in the general election for that office and shall not be denied the ability to place on the general election ballot the candidate who received, at the primary election, the highest vote among that party's candidates.

Fourth—That Section 6 of Article II thereof is amended to read:

SEC. 6.  (a) All judicial, school, county, and city offices, including the Superintendent of Public Instruction, shall be nonpartisan.

(b) ~~No~~ A political party or party central committee ~~may endorse, support, or oppose~~ shall not nominate a candidate for nonpartisan office, and the candidate's party preference shall not be included on the ballot for the nonpartisan office.

Fifth—This measure shall become operative on January 1, 2011.

## PROPOSITION 15

This law proposed by Assembly Bill 583 (Statutes of 2008, Chapter 735) is submitted to the people in accordance with the provisions of Article II, Section 10 of the California Constitution.

This proposed law adds sections to the Elections Code; adds and repeals sections of the Government Code; and adds and repeals sections of the Revenue and Taxation Code; therefore, provisions proposed to be deleted are printed in ~~strikeout type~~ and new provisions proposed to be added are printed in *italic type* to indicate that they are new.

**PROPOSED LAW**

SECTION 1.  Chapter 7 (commencing with Section 20600) is added to Division 20 of the Elections Code, to read:

CHAPTER 7.  FAIR ELECTIONS FUND

*20600.  (a) Each lobbying firm, as defined by Section 82038.5 of the Government Code, each lobbyist, as defined by Section 82039 of the Government Code, and each lobbyist employer, as defined by Section 82039.5 of the Government Code, shall pay the Secretary of State a nonrefundable fee of seven hundred dollars ($700) every two years. Twenty-five dollars ($25) of each fee from each lobbyist shall be deposited in the General Fund and used, when appropriated, for the purposes of Article 1 (commencing with Section 86100) of Chapter 6 of Title 9 of the Government Code. The remaining amount of each fee shall be deposited in the Fair Elections Fund established pursuant to Section 91133 of the Government Code. The fees in this section may be paid in even-numbered years when registrations are renewed pursuant to Section 86106 of the Government Code.*

*(b) The Secretary of State shall biennially adjust the amount of the fees collected pursuant to this section to reflect any increase or decrease in the Consumer Price Index.*

SEC. 2.  Section 85300 of the Government Code is repealed.

~~85300.  No public officer shall expend and no candidate shall accept any public moneys for the purpose of seeking elective office.~~

SEC. 3.  Section 86102 of the Government Code is repealed.

~~86102.  Each lobbying firm and lobbyist employer required to file a registration statement under this chapter may be charged not more than twenty-five dollars ($25) per year for each lobbyist required to be listed on its registration statement.~~

SEC. 4.  Chapter 12 (commencing with Section 91015) is added to Title 9 of the Government Code, to read:

CHAPTER 12.  CALIFORNIA FAIR ELECTIONS ACT OF 2008

*Article 1.  General*

*91015.  This chapter shall be known and may be cited as the California Fair Elections Act of 2008.*

*91017.  The people find and declare all of the following:*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **EXHIBIT C**

The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WASHINGTON STATE REPUBLICAN PARTY, BERTABELLE HUBKA, STEVE NEIGHBORS, MARCY COLLINS, MICHAEL YOUNG, DIANE TEBELIUS, MIKE GASTON, | Case No. C05-0927-JCC |
| Plaintiffs, | ORDER |
| and, | |
| WASHINGTON STATE DEMOCRATIC CENTRAL COMMITTEE, PAUL BERENDT, | |
| Plaintiff-Intervenors, | |
| and, | |
| LIBERTARIAN PARTY OF WASHINGTON STATE, RUTH BENNETT, J. S. MILLS, | |
| Plaintiff-Intervenors, | |
| v. | |
| WASHINGTON STATE GRANGE, | |
| Defendant-Intervenor, | |
| and, | |
| STATE OF WASHINGTON, ROB MCKENNA, SAM REED, | |
| Defendant-Intervenors. | |

ORDER
PAGE - 1

1

2       This matter comes before the Court on Defendant-Intervenor State of Washington's

3  ("State") Motion to Dismiss (Dkt. No. 133), Defendant-Intervenor Washington State Grange's

4  ("Grange") Motion to Dismiss (Dkt. No. 134), Plaintiff-Intervenor[1] Washington State

   Democratic Central Committee's ("Democratic Party") Motion to Amend and Supplement

5  Complaint (Dkt. No. 137), Plaintiff Washington State Republican Party's ("Republican Party")

6  Motion for Leave to File Supplemental and Amended Complaint (Dkt. No. 140), and the

7  State's Motion to Recover Attorney Fees and for Costs (Dkt. No. 130). Having thoroughly

8  considered the parties' briefing and the relevant record, the Court finds oral argument

9  unnecessary and hereby rules as follows.

10 **I.      BACKGROUND**

11      From 1935 until 2003, candidates for state and local office in Washington State were

12 nominated through a "blanket primary," whereby all candidates from all parties were placed on

13 a single ballot and voters could select a candidate from any party. *See Wash. State Grange v.*

14 *Wash. State Republican Party ("Grange")*, 128 S. Ct. 1184, 1187–88 (2008). The candidate

15 who won the plurality of votes within each major party became that party's nominee in the

16 general election. *Id.* at 1188. This "blanket primary" system was ultimately found to be

17 unconstitutional because it forced parties to allow nonmembers to participate in selecting the

18 parties' nominees. *Democratic Party of Wash. State v. Reed*, 343 F.3d 1198, 1207 (9th Cir.

19 2003); *see also Cal. Democratic Party v. Jones*, 530 U.S. 567, 586 (2000) (striking down an

20 identical primary system in California).

21      In 2004, Washington voters approved Initiative 872 ("I-872"), which established a

22 "modified blanket primary." *Grange*, 128 S. Ct. at 1189. Under this system, all elections for

23 "partisan office" start with a primary in which every candidate competes. *Id.* Each candidate

24

25 ─────────────────────

        [1] For simplicity, the Court will refer to Plaintiff-Intervenors as "Plaintiffs" and
26 Defendant-Intervenors as "Defendants" for the remainder of this Order.

ORDER
PAGE - 2

1   declares his or her "party preference or independent status," which is designated on the

2   primary ballot with the candidate's name. *See id.*; WASH. REV. CODE § 29A.24.031(3). A

3   candidate can choose to identify with whichever party he or she designates, even if that

4   political party would itself prefer otherwise. *See Grange*, 128 S. Ct. at 1189. Voters may select

5   any candidate listed on the ballot, regardless of party preference, and the two candidates that

6   receive the highest votes, regardless of their party designation, advance to the general election.

7   *Id.*; WASH. REV. CODE § 29A.52.112(2). In this manner, the general election in essence

8   becomes a runoff between the top-two vote getters in the primary.

9          On May 19, 2005, the Republican Party sued to have I-872 declared unconstitutional

10   and to enjoin its implementation. (*See* Rep. Compl. 12 (Dkt. No. 1).) That same day, the

11   Democratic Party and Libertarian Party moved to intervene as plaintiffs. (*See* Dkt. Nos. 2, 3.)

12   The Republican Party alleged that the new election scheme (1) compelled it to associate with

13   any candidate who expressed a "preference" for the party, thereby diluting the party's message;

14   (2) allowed candidates to "appropriate" the party's name without permission; (3) allowed party

15   nominees to be determined by voters whose beliefs were antithetical to those of the party, in

16   violation of *Jones*, 530 U.S. at 586; and (4) impermissibly denies major parties protections that

17   it offers to minor parties, in violation of equal protection.[2] (Compl. ¶¶ 16–23 (Dkt. No. 1 at 5–

18   7).) The Democratic Party made identical claims. (*See* Dem. Compl. (Dkt. No. 31).) The

19   Libertarian Party made similar First Amendment claims; additionally, it alleged that I-872

20   arbitrarily deprived minor parties access to the general election ballot.[3] (*See* Lib. Compl. ¶ 26–

21   27 (Dkt. No. 28).)

22   _____

23          [2] Prior to the enactment of I-872, minor-party candidates, unlike major-party
24   candidates, were selected through party nominating conventions. (*See* Order Granting Summ.
       J. 8 (Dkt. No. 87).) The Republican Party's equal protection argument was premised on its
25   understanding that these provisions survived the enactment of I-872.
              [3] Whereas the Republican and Democratic Party's equal protection arguments were
26   premised on the assumption that minor parties could still nominate their candidates through

ORDER
PAGE - 3

1    The Court set an expedited briefing schedule for Plaintiffs' summary judgment motions

2    and required the parties to stipulate to the legal issues that would be covered in the motions.

3    (*See* Minute Entry (Dkt. No. 45); Stipulated Statement of Legal Issues (Dkt. No. 40).) On July

4    15, 2005, the Court granted Plaintiffs' motions. (*See* Order Granting Summ. J. (Dkt. No. 87).)

5    It held that the modified blanket primary system still served to "nominate" party candidates,

6    despite having been recharacterized as a "winnowing" or a "qualifying" primary. (*Id.* at 25–

7    26.) Based on this holding, the Court held I-872 unconstitutional on two grounds. First, like the

8    blanket primary invalidated in *Jones*, the modified blanket primary "'force[d] political parties

9    to associate with—to have their nominees, and hence their positions, determined by—those

10   who, at best have refused to affiliate with their party, and, at worst, have expressly affiliated

11   with a rival,'" in violation of the First Amendment freedom of association. (*Id.* at 28 (*quoting*

12   *Jones*, 530 U.S. at 577).) Second, the Court held that by "allowing *any* candidate, including

13   those who may oppose party principles and goals, to appear on the ballot with a party

14   designation," I-872 would "foster confusion and dilute the party's ability to rally support

15   behind its candidates." (*Id.* at 30.) The Court found that the unconstitutional provisions of I-

16   872 could not be severed from the remaining provisions and therefore struck down the

17   initiative in its entirety. (*Id.* at 87.)

18   The Ninth Circuit affirmed. *Wash. State Republican Party v. Washington ("Wash. Rep.*

19   *I")*, 460 F.3d 1108, 1125 (9th Cir. 2006). The panel held that a candidate's self-identification

20   of party preference necessarily created an association between the candidate and the party. *Id.*

21   at 1121.  By allowing candidates to create such an association against the party's will, I-872

22   constituted "a severe burden on political parties' associational rights" that could not be

23   _____

24

25   nomination conventions, the Libertarian Party's ballot-access argument was based on the
     reverse assumption—that I-872 did not distinguish between major and minor parties, so the
     only way for a candidate to advance to the general election was to be in the two highest vote

26   getters. (*See* Lib. Compl. ¶¶ 16–17, 26–27 (Dkt. No. 28).)

ORDER
PAGE - 4

1    justified as narrowly tailored to compelling state interests. *Id.* at 1121, 1123. Accordingly, the

2    panel held I-872 to be unconstitutional on its face. *Id.* at 1124. The panel also deemed

3    Plaintiffs to be "prevailing parties" under 42 U.S.C. § 1988 and therefore entitled to recover

4    attorneys' fees on appeal from the State. (*See* 8/22/06 9th Cir. Fee Order 3 (Dkt. No. 131 at

5    12).) Plaintiffs and the State stipulated as to the specific amount of fees and costs owed to each

6    Plaintiff, and the Ninth Circuit approved the stipulated award. (*See* 10/3/06 9th Cir. Fee Order

7    2 (Dkt. No. 131 at 19).)

8         The Supreme Court, however, granted certiorari and reversed on the merits. *Grange*,

9    128 S. Ct. at 1196. The Court emphasized that Plaintiffs' challenge, as it had appeared before

10   the lower courts, was to I-872's constitutionality *on its face* and hence could only succeed if

11   Plaintiffs demonstrated that "the law [was] unconstitutional *in all of its applications*." *Id.* at

12   1190 (emphasis added) ("[A] plaintiff can only succeed in a facial challenge by establishing

13   that no set of circumstances exists under which the Act would be valid . . . ." (internal

14   quotation and alteration omitted)). The Court found that "the I-872 primary does not, by its

15   terms, choose parties' nominees." *Id.* at 1192. If a political party chose to nominate a candidate

16   through outside means, this nomination would not be so designated on the ballot, but "[t]he

17   First Amendment does not give political parties a right to have their nominees designated as

18   such on the ballot." *Id.* 1193 n.7. Instead, the Court found that each of Plaintiffs' arguments

19   relied on an assumption that voters would *misinterpret* a candidate's self-identified party

20   preference as some form of endorsement by the party. *Id.* at 1195. Having concluded that each

21   of Plaintiffs' arguments "rests on factual assumptions about voter confusion," the Court found

22   that "each fails for the same reason: In the absence of evidence, we cannot assume that

23   Washington's voters will be misled." *Id.* The Court explained that I-872 *could* be implemented

24   in such a way as to make clear that a candidate's party-preference designation does not

25   constitute an endorsement from or association with that political party. *Id.* at 1194. Therefore,

26   the Court rejected the facial challenge to I-872 and lifted this Court's injunction. *Id.* at 1195.

ORDER
PAGE - 5

1        On remand, the Ninth Circuit vacated its opinion and its orders granting attorneys' fees

2   and costs. *Wash. State Republican Party v. Washington ("Wash. Rep. II")*, 545 F.3d 1125,

3   1126 (9th Cir. 2008). The panel remanded the case back to this Court with instructions to (1)

4   "dismiss all facial associational rights claims challenging [I-872]"; (2) "dismiss all equal

5   protection claims," because I-872 repealed the regulations differentiating between major and

6   minor parties; and (3) "dismiss as waived all claims that [I-872] imposes illegal qualifications

7   for federal office, sets illegal timing for federal elections or imposes discriminatory campaign

8   finance rules because these claims were neither pled by the parties nor addressed in summary

9   judgment by the district court." *Id.* In contrast, the panel suggested that this Court "may allow

10  the parties to further develop the record with respect to the claims that [I-872]

11  unconstitutionally constrains access to the ballot and appropriates the political parties'

12  trademarks, to the extent these claims have not been waived or disposed of by the Supreme

13  Court." *Id.* Finally, the panel directed this Court to "make appropriate findings concerning the

14  parties' settlement of fees and should determine whether restitution or further fee awards are

15  appropriate . . . ." *Id.*

16       Now that the case is back before this Court, Defendants State and Grange move to

17  dismiss the action in the entirety. (Dkt. Nos. 133, 134.) They argue that all of Plaintiffs' claims

18  have been disposed of by the Supreme Court's opinion, either expressly or impliedly. (*See id.*)

19  In response, Plaintiffs argue that their complaints allege both facial and *as-applied* challenges

20  to I-872 and only the former were resolved by the Supreme Court. (Dkt. No. 150 at 6–9; Dkt.

21  No. 146 at 10–12; Dkt. No. 179 at 6–7.) They also argue that they raised "trademark" claims

22  that have not yet been resolved. (Dkt. No. 150 at 9–12; Dkt No. 146 at 12–20; Dkt. No. 179 at

23  7–8.) Finally, the Libertarian Party, and the Republican Party to a lesser extent, argues that its

24  ballot access claims have yet to have been meaningfully resolved. (Dkt. No. 179 at 8–11; *see*

25  *also* Dkt. No. 150 at 13.)

26

ORDER
PAGE - 6

1    Both the Republican and Democratic Parties also seek leave to amend their Complaints.

2    (Dkt. Nos. 137, 140.) They seek to supplement the Complaints with additional factual

3    allegations to support as-applied challenges to the implementation of I-872 that was adopted

4    once this Court's injunction was lifted. (*See* Dkt. No. 137 at 8; Dkt. No. 140 at 2.) They also

5    seek to add a novel state constitutional claim, citing the intervening case of *Washington*

6    *Citizens Action of Washington v. State ("WCAW")*, 171 P.3d 486 (Wash. 2007) for the

7    argument that I-872 was an invalid enactment because it failed to identify each of the

8    legislative provisions that it repealed. (Dkt. No. 137 at 7–8; Dkt. No. 140 at 2.)

9    Finally, the State seeks to recover the attorneys' fees and costs that it paid to Plaintiffs

10   when the Ninth Circuit determined them to be "prevailing parties" and seeks instead to recover

11   its own costs as the new prevailing party. (Dkt. No. 130.) In response, Plaintiffs argue that the

12   fee settlement is a binding contract despite the Supreme Court's reversal and that, at a

13   minimum, the State's claim of being the prevailing party is premature. (Dkt. No. 144 at 4–6;

14   Dkt. No. 148 at 5–7, 9; Dkt. No. 178 at 3–5.) Moreover, the Republican Party goes further and

15   argues that it should still be considered a prevailing party, despite its definitive loss on the

16   merits in the Supreme Court, because the losing appeal nonetheless prompted the State to alter

17   its implementation of I-872. (Dkt. No. 148 at 7–9.)

18   **II.    DISCUSSION**

19       **A.    Motions to Dismiss**

20       This Court may dismiss Plaintiffs' Complaints in their entirety "only if it is clear that

21   no relief could be granted under any set of facts that could be proved consistent with the

22   allegations." *Winn v. Ariz. Christian Sch. Tuition Org.*, 562 F.3d 1002, 1007 (9th Cir. 2009)

23   (internal quotation omitted). In considering a motion to dismiss, the Court must "accept all

24   factual allegations in the complaint as true and construe the pleadings in the light most

25   favorable to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

26   Defendants State and Grange argue that the Supreme Court disposed of the only alleged claims

ORDER
PAGE - 7

1    for which Plaintiffs were plausibly entitled to relief. (State Mot. to Dismiss 4 (Dkt. No. 133);

2    Grange Mot. to Dismiss 8 (Dkt. No.134).) In response, Plaintiffs claim that the Complaints

3    allege unresolved as-applied challenges to I-872, along with ballot-access and trademark

4    claims that the Supreme Court did not consider.

5                        **1.    As-Applied Challenge**

6          The Republican Party's Complaint alleges that I-892 "*as implemented by State officials,*

7    eliminates mechanisms . . . to protect the First Amendment rights of the Party.*" (Rep. Compl.

8    ¶ 4 (Dkt. No. 1 at 3) (emphasis added); *see also id.* ¶ 23 (alleging that "Defendants intend to

9    *administer* the State's partisan primary *in a manner* that denies the Party the right to nominate

10   its candidates and control the use of its name." (emphasis added)).) The Complaints of the

11   Democratic and Libertarian Parties make almost identical allegations. (*See* Dem. Compl. ¶¶ 4,

12   18 (Dkt. No. 31 at 3, 7); Lib. Compl. ¶¶ 17, 23 (Dkt. No. 28 at 7, 8).) When this Court decided

13   Plaintiffs' motions for summary judgment, it noted that it had "previously directed the parties

14   to limit their briefs to Plaintiffs' facial challenge of [I-872]. The Court reserved issues related

15   to Plaintiffs' as-applied challenge." (Order Granting Summ. J. 13 n.13 (Dkt. No. 87).)

16   Accordingly, the Court finds it clear that Plaintiffs' complaints alleged both facial *and* as-

17   applied challenges to I-892.[4]

18

19   _____

20          [4] The State suggests that Plaintiffs could not have brought an as-applied challenge to I-
     872 in May of 2005 because "the Initiative had not yet been implemented or applied." (State
21   Reply on Mot. to Dismiss 3 (Dkt. No. 164).) However, when this Court considered Plaintiffs'
     facial challenge, the parties agreed that it was ripe for adjudication and that the action was
22   justiciable based on the "alleged threat to the political parties' associational rights." (Order
23   Granting Summ. J. 13 (Dkt. No. 87).) To the extent that this alleged "threat" was based on the
     actual (if partial) implementation of some portion of I-872 (*see* Lib. Compl. ¶ 15 (referencing
24   emergency rules adopted on May 18, 2005, to implement I-872) (Dkt. No. 28 at 6–7)),
     Plaintiffs had grounds to bring an as-applied challenge, even if the Initiative's provisions had
25   not yet been applied to an election. *Cf. Cal. Pro-Life Council, Inc. v. Getman,* 328 F.3d 1088,
     1094 (9th Cir. 2003) ("Courts have long recognized that one does not have to await the
26   consummation of threatened injury to obtain preventive relief." (internal quotation omitted)).

1      Because this Court only addressed Plaintiffs' facial challenges, those were the only

2  issues on appeal. That fact was crucial to the Supreme Court's reversal, which repeatedly

3  emphasized the nature of the facial challenge before it. *See Grange*, 128 S. Ct. at 1187

4  (reversing because "respondents' arguments" that I-871 "impose[d] a severe burden on

5  political parties' associational rights" "rest on factual assumptions about voter confusion that

6  can be evaluated only in the context of an as-applied challenge . . . ."). The Court explained

7  that "[a]t bottom, respondents' objection to I-872 is that voters will be confused by candidates'

8  party-preference designation." *Id.* at 1193. The Court found that to presume such confusion

9  would be "sheer speculation." *Id.* "In the absence of evidence, we cannot assume that

10  Washington's voters will be misled. *That factual determination must await an as-applied*

11  *challenge*." *Id.* at 1195 (emphasis added).

12      The Court's opinion clearly left room for, indeed it invited, an as-applied challenge to

13  I-872. Because Plaintiffs raised as-applied challenges and the Supreme Court did not resolve

14  these claims, they retain valid claims that I-872, as implemented in practice, creates the sort of

15  voter confusion that might support a First Amendment claim for violation of the political

16  parties' associational rights. Those are the exact sort of "as-applied" issues that this Court

17  previously "reserved." (Order Granting Summ. J. 13 n.13 (Dkt. No. 87).)

18      Finally, the State seeks to narrowly construe the meaning of I-872's "implementation"

19  so as to exclude certain of Plaintiffs' as-applied challenges from the scope of this action. For

20  example, Plaintiffs explain that Washington's campaign disclosure laws have been integrated

21  into I-872's implementation, such that if a candidate for partisan office "has expressed a party

22  or independent preference . . . , that . . . designation shall be clearly identified in electioneering

23  communications, independent expenditures, or political advertising." WASH. REV. CODE

24  § 42.17.510. The State argues that this does not constitute an "implementation" of I-872, but

25  rather a "clarification" regarding the "implementation of the separate campaign disclosure

26  laws." (State Reply on Mot. to Dismiss 5 (Dkt. No. 164).) This distinction is beside the point.

ORDER
PAGE - 9

1    I-872 created the concept of a "party preference" that candidates would explicitly declare and

2    that would be designated with the candidates' names on the ballot. *See* WASH. REV. CODE

3    § 29A.24.031(3). As explained by the Supreme Court, the core of Plaintiffs' "objection to I-

4    872 is that voters will be confused by the candidates' party-preferences"—i.e., that voters will

5    infer "that the parties associate with, and approve of," the candidates whose names appear next

6    to the party on the ballot. *Grange*, 128 S. Ct. at 1193. To succeed on their as-applied challenge,

7    Plaintiffs must demonstrate that I-872 *in practice* actually creates the sort of voter confusion

8    that would infringe upon the political parties' associational rights. To the extent that

9    Washington's campaign disclosure requirements increase this voter confusion, that is clearly

10    relevant to Plaintiffs' as-applied challenge.

11        Plaintiffs also argue that I-872 is unconstitutional as-applied to the election of party

12    Precinct Committee Officers ("PCOs"). Each major party's PCOs sit on that party's county

13    central committee and certain PCOs sit on the party's state committee. *See* WASH. REV. CODE

14    §§ 29A.08.020, .030. A major party's state committee has the power to call conventions, to

15    provide for the election of delegates to the national party's convention and for the nomination

16    of presidential electors, and to fill vacancies on a ticket for certain federal or state offices. *See*

17    *See* WASH. REV. CODE §§ 29A.08.020. A party's county central committee also plays a role in

18    filling vacancies when a legislator or county executive belonging to that party leaves office.

19    WASH. CONST. art. 2, § 15. Plaintiffs claim that, since I-872's implementation, candidates for

20    the office of party PCO are no longer required to demonstrate membership in that party. (*See*

21    Dem. Resp. to Mot. to Dismiss 8 (Dkt. No. 146).) If true, the Court acknowledges that the

22    "party preference" scheme established by I-872 may be particularly problematic when applied

23    to the election of PCOs. The Supreme Court rejected Plaintiffs' argument that I-872 "allows

24    primary voters who are unaffiliated with a party to choose the party's nominee," because the

25    Court found that "unlike the California primary [invalidated in *Jones*], the I-872 primary does

26    not . . . choose the parties' nominees." *Grange*, 128 S. Ct. at 1192. But party PCOs are party

ORDER
PAGE - 10

1    leaders and they have direct control over certain party functions; therefore, it seems reasonable

2    that the application of I-872's party-preference designations and single, undifferentiated ballot

3    to PCO elections might raise associational claims that were not apparent on the face of the

4    initiative.[5]

5         The Court concludes that Plaintiffs have alleged as-applied challenges to I-872's

6    modified blanket primary scheme and that these claims remain unresolved. Plaintiffs may

7    submit evidence to demonstrate that (1) the State's actual implementation of I-872 (including

8    its interaction with the state's campaign disclosure laws) leads to voter confusion, and (2) that

9    this resulting confusion severely burdens the political parties' freedom of association. *See*

10   *Grange*, 128 S. Ct. at 1195. Plaintiffs may also demonstrate that the application of I-872 to

11   certain elected offices (e.g., party PCOs) specifically burdens the party's right to associate.

12   (Rep. Resp. to Mot. to Dismiss 6–9 (Dkt. No. 150).) Accordingly, Defendants' motions to

13   dismiss are DENIED with respect to these as-applied challenges.

14              **2.      Ballot-Access Claims**

15        In its Complaint, the Libertarian Party also alleged that "[t]he Fourteenth Amendment

16   equal protection and due process clauses guarantee reasonable access for minor party and

17   independent candidates to the general election ballot." (Lib. Compl. ¶ 26 (Dkt. No. 28 at 9).) It

18   argued before this Court that any candidate showing at least a "modicum of support" may not

19   constitutionally be excluded from the general election ballot. (Lib. Summ. J. Mot. 18 (Dkt. No.

20   _____

21        [5] The State argues that PCO elections "have nothing whatsoever to do with the
     implementation of I-872" and that these elections are governed by a "series of statutes enacted
22   long before I-872 was enacted, and left unchanged when I-872 was approved by the voters in
     2004." (State Reply to Mot. to Dismiss 4 (Dkt. No. 164).) As an initial matter, Plaintiffs' allege
23   that the PCO elections *were* changed in the implementation of I-872 (*see* Dem. Resp. to Mot.
     to Dismiss 8 (Dkt. No. 146), and, for the purpose of this motion to dismiss, the Court must
24   accept Plaintiffs' allegations as true. *See Knievel*, 393 F.3d at 1072. Moreover, that
     Washington has allowed PCOs to be elected from the general population since before I-872
25   hardly insulates the provision from challenge, given that the state's earlier election scheme was
     struck down as unconstitutional for exactly that reason. *See Reed*, 343 F.3d at 1203.
26

ORDER
PAGE - 11

1   52); *see also* Order Granting Summ. J. 11 (Dkt. No. 87). Because this Court granted summary

2   judgment on forced association grounds, it declined to reach the ballot-access issue. (Order

3   Granting Summ. J. 34 (Dkt. No. 87).) For that reason, the issue was not before either the Ninth

4   Circuit or the Supreme Court when they reviewed the case. *See Grange*, 128 S. Ct. at 1195

5   n.11 ("We do not consider the ballot access . . . arguments as they were not addressed below

6   . . . ."). Therefore, the Libertarian Party argues that its ballot-access claims remain unresolved.

7           The ballot-access argument is based on a line of Supreme Court cases that protected

8   minor parties' right to access the ballot. In *Williams v. Rhodes*, the Court invalidated an Ohio

9   statute that required a new party to obtain petitions signed by electors totaling 15% of the

10  number of ballots cast in the prior gubernatorial election, rendering it "virtually impossible for

11  a new political party . . . to be placed on the state ballot." 393 U.S. 23, 24–25 (1968). In finding

12  the requirement unconstitutional, the Court explained:

13          The right to form a party for the advancement of political goals means little if a
            party can be kept off the election ballot and thus denied the equal opportunity to
14          win votes. So also, the right to vote is heavily burdened if that vote may be cast
            only for one of two parties at a time when other parties are clamoring for a place
15          on the ballot.

16  *Id.* at 31; *see also Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983); *but see Jenness v.*

17  *Fortson*, 403 U.S. 431, 442 (1971) (noting that this right to equal ballot access is not absolute

18  and upholding a 5% petition requirement).

19          As an initial matter, although the Court's statements in *Williams* seem to arguably

20  support the Libertarian Party's position, there is much to distinguish I-872's modified blanket

21  primary from the system invalidated in that case. Most importantly, in the election schemes at

22  issue in *Williams* and its progeny, the general election was a minor party's only opportunity to

23  reach the statewide electorate by ballot. *Munro v. Socialist Workers Party*, 479 U.S. 189, 199

24  (1986). The Supreme Court has long made clear that there is a "significant difference" between

25  a scheme like that and one, like Washington's, that "virtually guarantees" minor parties access

26  to a statewide primary ballot. *Id.* If minor parties are given equal access to compete in a

ORDER
PAGE - 12

1   statewide primary, "[i]t can hardly be said that Washington's voters are denied freedom of

2   association because they must channel their expressive activity into a campaign at the primary

3   as opposed to the general election." *Id.*

4       Indeed, in the election scheme set forth by I-872, the general election becomes, for all

5   intents and purposes, a runoff election between the top-two vote getters of the primary. Putting

6   aside the issue of "party preference" and forced association, there can be no doubt that the

7   "top-two" aspect of I-872 would be permissible if the "primary" were renamed a "general

8   election," and the "general election" were renamed a "runoff." Yet the constitutionality of the

9   election statute cannot turn on the identifiers used for its various provisions.

10       Most importantly, the Supreme Court has explicitly approved of the use of a "top-two"

11   general election. In *Jones*, the Court invalidated California's blanket primary in part because it

12   was not narrowly tailored to the state's asserted interest. 530 U.S. at 585. The Court noted that

13   the state could satisfy those same interests by establishing a system as follows:

> [T]he State determines what qualifications it requires for a candidate to have a
> place on the primary ballot—which may include nomination by established
> parties and voter-petition requirements for independent candidates. Each voter,
> regardless of party affiliation, may then vote for any candidate, and the top two
> vote getters (or however many the State prescribes) then move on to the general
> election.

17   *See id.* (referring to such a system as a "nonpartisan primary"). When this case reached the

18   Supreme Court, it reiterated that "Petitioners are correct that we assumed that the nonpartisan

19   primary we described in *Jones* would be constitutional." *Grange*, 128 S. Ct. at 1192

20   (distinguishing between that scheme and I-872 only on the basis of the stated "party

21   preference").

22       Of course, the hypothetical primary scheme that the Court endorsed in *Jones* would *by*

23   *definition* exclude many parties from the general election ballot. Indeed, it is not unforeseeable

24   that the candidates with the highest and second-highest vote totals would be from the same

25   party, thereby excluding other major and minor political parties alike. *See id.* at 1189 & n.5.

26

ORDER
PAGE - 13

1    The Supreme Court's unqualified endorsement of its top-two voting proposal is confirmation

2    of this Court's interpretation of *Munro* and *Williams*—that after giving all political parties

3    equal and sufficient access to a statewide primary, limiting the general election to the top-two

4    vote getters does not violate the other parties' right to ballot access.

5         The Republican Party makes a variant of this claim, which it terms "*operational* denial

6    of ballot access" (*see* Rep. Resp. to Mot. to Dismiss 13 (Dkt. No. 150)), but this argument is no

7    more successful than the general ballot-access claim. The argument goes that "if seven

8    candidates carrying [the same] party name each receive 10% of the vote at a partisan primary,

9    and two candidates of other parties each receive 15%, [no candidate of the former party would

10   appear] on the general election ballot, despite the receipt by candidates carrying [that] party's

11   identification of 70% of the total vote." (Rep. Compl. ¶ 21 (Dkt. No. 1 at 7); Dem. Compl. ¶ 16

12   (Dkt. No. 31 at 6–7).)

13        This contrived example does not withstand close scrutiny. The Supreme Court held that

14   "the I-872 primary does not, by its terms, choose parties' nominees"; instead, parties are now

15   free to "nominate candidates by whatever mechanism they choose" and to advocate for and

16   support those nominees outside the ballot. *Grange*, 128 S. Ct. at 1192. The Court also

17   unequivocally stated that "[t]he First Amendment does not give political parties a right to have

18   their nominees designated as such on the ballot." *Id.* at 1193 n.7.  If a party nominates a

19   candidate in the primary, it is only entitled to have its nominee advance to the general election

20   if that nominee is one of the top-two vote getters. *See id.* at 1192 (reiterating the Court's belief

21   that the top-two primary "described in *Jones* would be constitutional"). If six other candidates

22   choose to identify with that party against its will, that does not entitle the party to have any one

23   of those "imposter" candidates advance to the general election.[6] Or, on the other hand, if the

24   _____

25        [6] To the extent that vote dilution from the party's nominee to these "imposter"
     candidates stems from voter confusion about the meaning of the "party preference," the party
26   might be able to prove an as-applied forced association claim. *See supra*, II.A.1.  However,

ORDER
PAGE - 14

1   party does not make a nomination and remains agnostic as between the seven candidates

2   running under its banner, it will have itself brought on the risk of vote dilution and will have

3   only itself to blame.

4        The Supreme Court opinions in this case and in *Jones* foreclose Plaintiffs' ballot-access

5   claims. That applies equally to the claim that minor parties are denied access to the general

6   election ballot and to the claim that major parties could be "operationally" denied such access.

7   Therefore, the Court GRANTS Defendants' motions to dismiss as to Plaintiffs' ballot-access

8   claims.

9                      **3.    Trademark Claims**

10       Plaintiffs also argue that they have unresolved "trademark" claims in this case. (Dkt.

11  No. 150 at 9–12; Dkt No. 146 at 12–20; Dkt. No. 179 at 7–8.) Neither the Republican Party nor

12  the Democratic Party explicitly alleged trademark violations; instead, as part of their forced

13  association arguments, those parties alleged that "[a]ny individual may appropriate the Party's

14  name, regardless of whether the Party desires affiliation with that person. (Rep. Compl. ¶ 17

15  (Dkt. No. 1 at 5); Dem. Compl. ¶ 12 (Dkt. No. 31 at 5).) The Libertarian Party came closer to

16  raising an actual trademark claim, alleging:

17          I-872 deprives the [Party] of its proprietary right to the use of the party name,
            thus leading to voter confusion regarding which candidate(s) are speaking for
18          the party and which are imposters or renegades appropriating the party name for
            their own purposes. The name "Libertarian Party" is a nationally trademarked
19          name and therefore may be used by candidates only with [the Party's] consent.

20  (Lib. Compl. ¶ 20 (Dkt. No. 28 at 8).) However, other than this passing reference, the

21  complaint makes no allegation of trademark infringement on the part of Defendants and makes

22  no reference to the Lanham Act, 15 U.S.C. § 1125(a), or Washington State trademark law. (*Id.*)

23

24

_____

25

26  there is no reason to duplicate and recharacterize this forced association claim as an
    "operational denial of ballot access."

ORDER
PAGE - 15

1   Accordingly, the Court concludes that Plaintiffs did not properly raise trademark violations in

2   their complaints.[7]

3       Moreover, even if Plaintiffs had raised trademark claims at the start of this case, the

4   Court would dismiss those claims as being without merit. There can be no doubt that the mere

5   statement of *preference* for one party over others does not implicate trademark protection for

6   that party's name; indeed, Plaintiffs do not argue otherwise. Instead, they argue that the

7   statements of party preference may be made in ways that lead to voter confusion or dilution of

8   their "famous marks." (*See* Dem. Resp. to Mot. to Dismiss 16, 17 (Dkt. No. 146).) To

9   understand these claims, the Court must distinguish between two different types of

10  statements—those made directly by the State (e.g., on the ballot, in the voter's pamphlets) and

11  those made by the candidates themselves (e.g., in political advertising).

12      As for statements made by the State on the ballot or in voter's pamphlets, the Court

13  finds that these uses of the parties' names are not covered under either federal or state

14  trademark law. Trademark law is designed, first and foremost, to protect the owners of a mark

15  against improper *commercial* uses. *See, e.g.*, 15 U.S.C. § 1125(a) (limiting trademark

16  confusion and misrepresentation actions to "uses in commerce" "in connection with any goods

17  or services or any container for goods"); 15 U.S.C. § 1125(c)(3)(C) (specifically excluding

18  "noncommercial use[s] of a mark" from trademark dilution actions); WASH. REV. CODE

19  § 19.77.140, .160 (providing similar limitations under state law). Although trademark

20  protections have been extended to nonprofit and political groups, *see United We Stand*

21  *America, Inc. v. United We Stand America New York, Inc. ("United We Stand")*, 128 F.3d 86,

22  89–90 (2d. Cir. 1997), those protections cannot justify extending federal trademark regulation

---

24      [7] The Supreme Court noted in a footnote that the Libertarian Party "argue[d] that I-872
25  is unconstitutional because of its implications for . . . trademark protection of party names
    . . . ." *Grange*, 128 S. Ct. at 1195 n.11. However, the fact that the Libertarian Party made that
26  argument to the Supreme Court does not mean that it properly raised the claim in its initial
    Complaint.

ORDER
PAGE - 16

1    to state ballots. In *United We Stand*, a new political organization split off from its parent

2    political organization and began appropriating the parent organization's trademark in its

3    political activities. *Id.* at 88. The Second Circuit held that the new organization's political

4    activities (e.g., political organizing, endorsing candidates, distributing political literature) were

5    "services" within the meaning of 15 U.S.C. § 1125(a), because "[a]lthough not undertaken for

6    profit, they unquestionably render a service." *United We Stand*, 128 F.3d at 90. Unlike the

7    organizational activities at issue in *United We Stand*, the State's administration of an election

8    cannot reasonably be analogized to a commercial "service." Moreover, Plaintiffs fail to

9    explain, and the Court fails to see, how the State's statements on the ballot or in the voter

10   pamphlets can reasonably be considered to have been made "in commerce."[8] Accordingly, the

11   Court concludes that the State's expression of candidates' party preferences on the ballot and

12   in the voter pamphlets may not form the basis of a federal or state trademark violation.

13          Plaintiffs also point to Washington's campaign disclosure laws, which require that a

14   candidate who has expressed a party preference on the declaration of candidacy clearly identify

15   that preference in "electioneering communications, independent expenditures, or political

16   advertising." WASH. REV. CODE § 42.17.510(1); *see also* PDC's 2008 "Political Advertising"

17   Brochure, http://www.pdc.wa.gov/archive/guide/brochures/pdf/2008/2008.Bro.Adv.pdf

18   (allowing common political party abbreviations or official symbols or logos to be used as

19   identification). A candidate's electioneering and political advertising falls much closer to the

20   sorts of "services" that could be covered under trademark law. *See United We Stand*, 128 F.3d

21   _____

22          [8] Certain references to "commerce" in the trademark laws are meant to broadly invoke
     Congress's power under the Commerce Clause, *see United We Stand*, 128 F.3d at 92, but
23   trademark dilution actions under 15 U.S.C. § 1125(c) must actually be "commercial" in nature.
     *See Panavision Intern., L.P. v. Toeppen*, 141 F.3d 1316, 1324 (9th Cir. 1998) (requiring
24   plaintiff to prove that "defendant is making a commercial use of the mark in commerce" and
     noting that the registration of a domain name, without more, is not a commercial use).
25   Plaintiffs fail to demonstrate how the wording of the State's ballot or voter pamphlet falls
     under either definition of "commerce."
26

ORDER
PAGE - 17

1    at 90. However, to the extent that a candidate's statements could constitute a trademark

2    violation, that violation would have been committed by the candidate, not the State; the State

3    would presumably only be liable if it had *required* the candidate to improperly appropriate a

4    political party's trademark. Nothing in I-872 requires a candidate to state a party preference,

5    WASH. REV. CODE § 29A.24.030(3) (allowing each "candidate to indicate his or her major or

6    minor party preference, *or independent status*"), and nothing in Washington's campaign

7    disclosure laws requires a candidate who has stated a party preference to disclose his or her

8    preference in a manner that would violate that preferred party's trademark, *see* WASH. REV.

9    CODE § 42.17.510(1) (requiring only that the "party or independent designation shall be clearly

10   identified" on applicable communications). A candidate who has stated a party preference may

11   satisfy the campaign disclosure laws without appropriating the party's trademark simply by

12   identifying the party designation in a manner that makes clear that it only indicates a

13   *preference* for that party. *Cf. Grange*, 128 S. Ct. at 1193 (finding no basis to presume that a

14   well-informed electorate would be confused by a statement of party preference). That the state

15   allows candidates to satisfy its campaign disclosure requirement through the use of

16   abbreviations or logos is beside the point; many candidates (e.g., those that are supported or

17   endorsed by the party) will presumably be allowed to use those abbreviations or logos without

18   violating the party's trademark. If an "imposter" candidate chose to identify with a party

19   against its will and attempted to satisfy the state's campaign disclosure laws by

20   misappropriating the party's name, common abbreviation, or logo, then that candidate might

21   arguably be liable for a trademark violation; however, nothing in Washington law would

22   require or even encourage such misappropriation, so none of the Defendants in this case would

23   be liable for that violation.

24        The Court finds that Plaintiffs failed to properly allege trademark violations under

25   federal or state law and that any claims they have subsequently argued are without merit.

26   Accordingly, the Court GRANTS Defendants' motion to dismiss any trademark violations.

ORDER
PAGE - 18

### B.    Motions to Amend

The Republican and Democratic Parties have both moved to supplement and amend their Complaints. (Dkt. Nos. 137, 140.) Under Federal Rule of Civil Procedure 15(a), once a responsive pleading has been served, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." "The policy of allowing amendments is to be applied with extreme liberality." *Waldrip v. Hall*, 548 F.3d 729, 732 (9th Cir. 2008) (internal quotation omitted). Courts may consider several factors, including "bad faith, undue delay, prejudice to the opposing party, futility of the amendment, and whether the party has previously amended his pleadings." *Id.*

The Democratic Party moves to amend its Complaint in Intervention to:

(1) Delete[] and add[] parties to reflect dismissals, withdrawals, substitutions and interventions that have occurred since the original Complaint in Intervention was filed;

(2) Supplement[] the factual allegations with respect to the proposed implementation of I-872 that led to this litigation in order to conform to evidence received and considered by the Court after the date of the original pleading;

(3) Supplement[] the factual allegations to set forth material transactions, events and occurrences that have happened after the date of the original Complaint in Intervention to reflect the State's abandonment of its original implementation of I-872 and its new implementation of I-872 adopted in 2008;

(4) Supplement[] the Democratic Party's cause of action for forced association to enumerate further the associations forced upon the Party by the State's implementation of I-872;

(5) Supplement[] the Democratic Party's cause of action for injunctive relief to include as a basis selective enforcement of election laws by State officials.

(6) Add[] a new cause of action challenging the constitutionality of I-872 in light of the State's position taken in this proceeding after the date of the original Complaint in Intervention, and in its proposed implementation of I-872, that I-872 impliedly repealed or amended various election laws that were not included in the text of the initiative as required by Article II, § 37 of Washington's constitution.

ORDER
PAGE - 19

1    (Dem. Mot. to Amend 2 (Dkt. No. 137).) The Republican Party moves to make similar

2    amendments and substitutions to its Complaint. (*See* Rep. Mot. to Amend (Dkt. No. 140).)

3            As the Court has described above, Plaintiffs have alleged unresolved as-applied forced

4    association challenges to the State's implementation of I-872. *See supra*, II.A.1. Because the

5    implementation of I-872 has crystallized and evolved since the Complaints were first filed in

6    2005, the Court finds that it is imperative that Plaintiffs be granted leave to amend in order to

7    clarify their specific challenges to the current implementation. Allowing such amendment will

8    identify the relevant issues moving forward so as to focus and limit the scope of the litigation

9    regarding the as-applied First Amendment claims.

10           Although not strictly necessary, the Court also approves Plaintiffs' requests to update

11   their pleadings to reflect the changed parties in the litigation and to add any relevant facts that

12   have occurred since the original filings. However, any new factual allegations should be

13   relevant to the ongoing as-applied First Amendment challenge. For example, the Court is

14   doubtful of the necessity of "[s]upplement[ing] the factual allegations with respect to the

15   proposed implementation of [I-872] that led to this litigation." (Dem. Mot. to Amend. 2 (Dkt.

16   No. 137).) One seeking declaratory and injunctive relief may only bring an as-applied

17   challenge to a statute *as it is currently being applied.* At this juncture, therefore, any alleged

18   deficiencies with the initial proposed implementation of I-872 are irrelevant. If Plaintiffs wish

19   to include such facts to explain the history of the litigation or to provide necessary context, the

20   Court is not opposed; however, Plaintiffs should limit their allegations of constitutional

21   violations to the *current* implementation of I-872.

22           Moreover, it is important that Plaintiffs' amended pleadings are updated to reflect not

23   only their specific challenges to the State's implementation of I-872 but also the specific relief

24   they request to remedy those challenges. The initial Complaints focused on Plaintiffs'

25   challenges to I-872's facial validity; as a result, Plaintiffs requested broad relief "[d]eclaring [I-

26   872] unconstitutional and declaring that the primary system in effect immediately before the

ORDER
PAGE - 20

1    passage of I-872 remains in effect." Since then, however, the Supreme Court has upheld the

2    facial validity of I-872, explicitly finding "that there are a variety of ways in which the State

3    could implement I-872 that would eliminate any real threat of voter confusion." *Grange*, 128

4    S. Ct. at 1193–94 (noting that each of Plaintiffs' contentions "depend . . . on the possibility that

5    voters will be confused as to the meaning of the party-preference designation"). Now that the

6    Supreme Court has held that I-872 can be implemented without violating Plaintiffs' right to

7    association, Plaintiffs will not be able to strike down I-872 in its entirety. Instead, the best that

8    Plaintiffs can achieve is to invalidate certain portions of I-872's implementation and enjoin the

9    State from implementing I-872 in specific ways that lead to voter confusion or other forms of

10   forced association. For example, if Plaintiffs' challenge the specific wording used on the ballot

11   or in the voter's guide, they should identify the language currently used and request specific

12   relief to remedy any resulting confusion. Similarly, if Plaintiffs challenge the application of I-

13   872 to the election of party PCOs (*see* Dem. Resp. to Mot. to Dismiss 11 (Dkt. No. 146)), they

14   should identify how to remedy this specific application.

15        Finally, the Court denies the Republican and Democratic Parties' request to add novel

16   challenges to I-872's enactment based on article II, section 37 of the Washington constitution.

17   (*See* Dem. Mot. to Amend 2 (Dkt. No. 137); Rep. Mot. to Amend 7 (Dkt. No. 140).) Article II,

18   section 37 provides that "[n]o act shall ever be revised or amended by mere reference to its

19   title, but the act revised or the section amended shall be set forth at full length." WASH. CONST.

20   art. II, § 37. The purpose of this section is (1) "to avoid amendatory legislation that merely

21   substitutes one phrase for another, without examination of the original statute, such that the

22   amendatory statute, standing alone, conveyed no meaning at all"; (2) "to ensure disclosure of

23   the general effect of the new legislation"; and (3) "to show its specific impact on existing laws

24   in order to avoid fraud or deception." *WCAW*, 171 P.3d at 491. However, that section of the

25   state constitution only applies to "amendatory" legislation, so a reviewing "'court must [first]

26   determine whether the bill is such a complete act that the scope of the rights created or affected

ORDER
PAGE - 21

1   by the bill can be ascertained without referring to any other statute or enactment.'" *Id.* (quoting

2   *Citizens for Responsible Wildlife Mgmt. v. State ("CRWM")*, 71 P.3d 644, 654 (Wash. 2003).

3   The Washington Supreme Court has read section 37 narrowly, noting that it "does not apply in

4   all cases where a new act, in effect, amends another. Where the new law is independent, and no

5   further search is required to know the law which the new act covers, the new act does not come

6   within section 37." *CRWM*, 71 P.2d at 654 (internal quotation omitted).

7        In their initial Complaints, the Republican and Democratic Parties argued that I-872

8   violated equal protection by allowing minor parties to skip the modified blanket primary and

9   instead to nominate candidates for the general election through a convention process. (*See, e.g.*,

10  Rep. Compl. ¶ 22–23 (Dkt. No. 1).) This Court rejected that argument, concluding that I-872

11  treated minor parties the same as all other parties. (Order Granting Summ. J 31–34 (Dkt. No.

12  87).) Although the initiative did not expressly repeal, amend, or otherwise address the previous

13  minor-party nominating statutes, it specifically defined a primary as "a procedure for

14  winnowing candidates for public office to a *final list of two* as part of a special or general

15  election." I-872 § 5 (emphasis added). Moreover, the Court noted that the 2004 Voter's

16  Pamphlet expressly stated that the initiative would treat major and minor parties alike. (*See*

17  Order Granting Summ. J 32–33 (Dkt. No. 87).) The Court concluded "as a matter of law that it

18  was the intent of the voters who enacted [I-872] that it be a complete act in itself and cover the

19  entire subject matter of earlier legislation governing minor parties." (*Id.* at 33.)

20       The Republican and Democratic Parties now argue that there are "colorable questions

21  of state law" as to whether I-872 violated article II, section 37 of the Washington constitution

22  by not explicitly stating that it would repeal the minor-party nominating statutes. (*See, e.g.*,

23  Dem. Mot. to Amend 7 (Dkt. No. 137).) Accordingly, they move to amend their Complaints to

24  add this new claim based on the state constitution. (*Id.* at 2.)

25       As an initial matter, neither party provides any reasonable justification for not bringing

26  this claim in its initial Complaint. They purport to rely on *WCAW*, 171 P.3d 486, which was

ORDER
PAGE - 22

1    decided while this case was on appeal. (*See* Dem. Mot. to Amend 7 (Dkt. No. 137); Rep. Mot.

2    to Amend 5 (Dkt. No. 140).) However, *WCAW* concerned a narrow question: whether

3    amendatory initiatives need to set forth the content of the statute being amended as it stands at

4    the time the initiative is *filed* or at the time of the *vote*. *WCAW*, 171 P.3d at 496 (concluding the

5    later). The basic requirement under article II, section 37 that "amendatory laws set forth at full

6    length the law to be amended," *id.* at 488, had long preexisted *WCAW*. As this Court

7    previously described, I-872 clearly intended to repeal the minor-party nomination process (*see*

8    Order Granting Summ. J 31–34 (Dkt. No. 87)) even though it did not explicitly state that it was

9    repealing those statutes (*id.*). As a result, the parties had the factual basis to raise their state

10   constitutional claim back in 2005.

11          Moreover, even if the parties had a reasonable justification for failing to raise this claim

12   at the outset, the Court would decline to exercise supplemental jurisdiction. Under 28 U.S.C.

13   § 1367, this Court may exercise supplemental jurisdiction over state law claims "that are so

14   related to claims in the action . . . that they form part of the same case or controversy under

15   Article III." "A state law claim is part of the same case or controversy when it shares a

16   'common nucleus of operative fact' with the federal claims and the state and federal claims

17   would normally be tried together." *Bahrampour v. Lampert*, 356 F.3d 969, 978 (9th Cir. 2004).

18   In this case, the remaining federal claims solely concern an as-applied challenge to I-872's

19   *implementation* (i.e., whether the initiative, as applied, forces the political parties to associate

20   with nonmembers against their will). In contrast, this newly alleged state law claim solely

21   concerns I-872's *enactment* (i.e., whether the initiative properly identified the statutes it

22   intended to amend and repeal so as to comply with the state constitution). These questions are

23   entirely distinct from one another and share no apparent factual similarity; therefore, the Court

24   is doubtful that the newly asserted state constitutional claim is sufficiently related to the

25   remaining as-applied First Amendment challenge to assert supplemental jurisdiction under 28

26   U.S.C. § 1367(a).

ORDER
PAGE - 23

1      Finally, the Court may decline to exercise supplemental jurisdiction over a related

2  claim that "raises a novel or complex issue of State law" or "substantially predominates over

3  the [federal] claim[s]." *See* 28 U.S.C. § 1367(c)(1)–(2). If either of these circumstances is

4  present, the Court should decline jurisdiction if doing so "comports with the underlying

5  objective of most sensibly accommodating the values of economy, convenience, fairness, and

6  comity." *O'Connor v. Nevada*, 27 F.3d 357, 363 (9th Cir. 1994) (internal quotation and

7  alterations omitted). The applicability of article II, section 37 to I-872's enactment undoubtedly

8  raises novel and complex issues of state constitutional law best decided by the state courts. *See*

9  *id.* at 363 (finding a difficult question of state constitutional law "is the very sort of 'novel'

10  issue that will usually justify declining jurisdiction over the claim").

11    **C.    Fees**

12      Finally, the State moves to recover the attorneys' fees that it paid to Plaintiffs after the

13  Ninth Circuit concluded that they were "prevailing parties" in the litigation before that Court.

14  (*See* Mot. to Recover Fees 2–3 (Dkt. No. 130).) The State argues that Plaintiffs are no longer

15  "prevailing parties" because the Ninth Circuit decision in their favor was reversed by the

16  Supreme Court and the panel order granting attorneys' fees was vacated. *See Wash. Rep. II*,

17  545 F.3d at 1126. The State also claims that it is the new prevailing party, entitled to recover

18  its own costs under Federal Rule of Appellate Procedure 39(a)(3). (*See* Mot. to Recover Fees 3

19  (Dkt. No. 130) (seeking $306.78 in costs).)

20      Plaintiffs make several arguments in opposition to the State's motion. First, the

21  Republican Party argues that it is still a prevailing party entitled to its attorneys' fees on

22  appeal. (Rep. Resp. to Mot. to Recover Fees 8 (Dkt. No. 148).) To support this argument, the

23  party claims that that the State materially altered the implementation of I-872 as a result of this

24  lawsuit—notably, the State changed the proposed ballot to make it clearer that the party-

25  preference designations were not meant to signify actual associations between the candidates

26  and the parties in the question. (*Id.* at 4–5.) The Republican Party cites *Farrar v. Hobby* for the

ORDER
PAGE - 24

1  proposition that "a plaintiff 'prevails' when actual relief on the merits of his claim materially

2  alters the legal relationship between the parties by modifying the defendant's behavior in a way

3  that directly benefits the plaintiff," 506 U.S. 103, 111 (1992), and it argues that the changed

4  ballot constitutes a "material alter[ation]" in the parties' "legal relationship" (Rep. Resp. to

5  Mot. to Recover Fees 9 (Dkt. No. 148)). However, the party ignores the clear statement in

6  *Farrar* that to be considered a prevailing party "[t]he plaintiff must obtain *an enforceable*

7  *judgment against the defendant* from whom fees are sought . . . or comparable relief through *a*

8  *consent decree or settlement.*" 506 U.S. at 111; *see also Buckhannon Bd. & Care Home, Inc. v.*

9  *West Virginia*, 532 U.S. 598, 605 (2001) (rejecting the "catalyst theory" that a plaintiff can be

10 considered a "prevailing party" based on a defendant's voluntary change in behavior). In

11 vacating its order granting attorneys' fees and costs, the Ninth Circuit made clear that Plaintiffs

12 are no longer the prevailing parties in the appeal. *See Wash. Rep. II*, 545 F.3d at 1126.

13      In the alternative, Plaintiffs argue that even if they are no longer prevailing parties, they

14 are entitled to keep the fees because the State is bound by the stipulation that was filed with the

15 Ninth Circuit. (*See, e.g.*, Dem. Resp. to Mot. to Recover Fees 4–6 (Dkt. No. 144).) The parties

16 agree that the stipulation, like any settlement, is a contract that must be interpreted under state

17 law. *See Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989). Washington follows "the

18 objective manifestation theory of contracts," whereby courts attempt to determine the parties'

19 intent by looking to the reasonable meaning of the words used. *Hearst Commc'ns, Inc. v.*

20 *Seattle Times Co.*, 115 P.3d 262 (Wash. 2005) (explaining that the subjective intent of the

21 parties is generally irrelevant if the intent can be determined from the actual words used).

22 Under the "context rule" set forth in *Berg v. Hudesman*, 801 P.2d 222 (Wash. 1990), certain

23 forms of extrinsic evidence may be admissible to interpret the meanings of specific words and

24 terms used in the agreement; such evidence may include "(1) the subject matter and objective

25 of the contract, (2) all the circumstances surrounding the making of the contract, (3) the

26 subsequent acts and conduct of the parties, and (4) the reasonableness of respective

ORDER
PAGE - 25

1   interpretations urged by the parties." *See Hearst*, 115 P.3d at 266. However, extrinsic evidence

2   is *not* admissible to "show an intention independent of the instrument or to vary, contradict or

3   modify the written word." *Id.* at 267 (internal quotation omitted). In particular, under the parol

4   evidence rule, "prior or contemporaneous negotiations and agreements are said to merge into

5   the final, written contract," so evidence of those negotiations is inadmissible. *Emrich v.*

6   *Connell*, 716 P.2d 863, 866 (1986).

7           On August 22, 2006, the day the Ninth Circuit filed its opinion in favor of Plaintiffs,

8   the appellate panel issued an order "award[ing] reasonable attorney's fees to the political

9   parties as against the State of Washington." (*See* 8/22/06 9th Cir. Fee Order 3 (Dkt. No. 131 at

10  12).) On September 18, 2006, Plaintiffs and the State filed a signed document with the Court in

11  which they stipulated:

12          "[Plaintiffs] are entitled to an order requiring the State to pay [Plaintiffs']
            attorneys' fees and costs in the following amounts, incurred to date in the Ninth
13          Circuit portion of the Appeal:

14          Republican Party: $54,457.65 (attorneys' fees); $639.60 (costs)
            Democratic Party: $37,460.77 (attorneys' fees); $213.20 (costs)
15          Libertarian Party: $14,977.80 (attorneys' fees); $1,323.32 (costs)

16  (9/18/06 Fee Stipulation 2 (Dkt. No. 131 at 16).) The stipulation further stated that "[n]o

17  waiver is intended of any claims for further proceedings in the appeal or in any other aspect of

18  the case . . . ." (*Id.*)

19          Under the *Berg* "context rule," this Court must consider the Ninth Circuit's prior

20  determination of fee liability as part of the "circumstances surrounding the making of the

21  contract" when interpreting the words of the agreement to discern the parties' mutual intent.

22  *See Hearst*, 115 P.3d at 266. Placed in the context of this prior order, the Court finds that the

23  reasonable interpretation of the contract's text is that the parties were stipulating to the specific

24  "amounts" the State owed each party, not to the State's overall liability for attorneys' fees

25  (which had already been determined by the Ninth Circuit). The parties' explicit statement that

26  "no waiver [was] intended of any claims for further proceedings" plainly reserved the State's

ORDER
PAGE - 26

1    right to bring any claims in further proceedings that it could otherwise bring, including a claim

2    that it was entitled to reimbursement of attorneys' fees because the Ninth Circuit's decision

3    had been reversed on the merits. *See Cal. Med. Ass'n v. Shalala*, 207 F.3d 575, 577–78 (9th

4    Cir. 2000) ("Since the fee award is based on the merits judgment, reversal of the merits

5    removes the underpinnings of the fee award.").

6          Both the Republican and Democratic Parties seek to introduce extrinsic evidence that

7    they had informed the State by e-mail during negotiations that they "underst[oo]d this

8    settlement will be final as to our claims for attorneys' fees and costs for the Ninth Circuit

9    proceedings . . . irrespective of further proceedings in the case." (9/15/06 E-mail from James

10   Pharris (Dkt. No. 145 at 7); *see also* 9/15/06 E-mail from John White (Dkt. No. 149 at 35).)

11   Under the parol evidence rule, however, evidence of "prior or contemporaneous negotiations"

12   are inadmissible to prove an intention independent of the instrument. *See Hearst*, 115 P.3d at

13   267. If the political parties had wished to make their subjective "understanding" of the contract

14   binding upon the State, they should have added this additional term to the signed stipulation.

15         Accordingly, the Court finds that the stipulation between the State and the political

16   parties extended only to the "amounts" owed to each party.[9] Because the Supreme Court

17   reversed the Ninth Circuit on the merits and the appellate panel subsequently vacated its prior

18   order finding the State liable for fees and costs, the State is entitled to be reimbursed those

19   funds.

20

21   ───────────────────────

22        [9] Both the Republican and Democratic parties argue that this interpretation of the
     stipulation renders the contract "illusory." (*See, e.g.*, Rep. Resp. to Mot. to Recover Fees 6

23   (Dkt. No. 148) ("The Republican Party would have permanently conceded a portion of the fees
     to which it was entitled, but the State had merely made a 'refundable deposit.').) However, the

24   Court's plain-meaning interpretation of the stipulation is still supported by consideration from
     all parties. Indeed, the consideration is the same as that in any settlement agreement: each party

25   gave up its right to undertake further litigation (as to the specific amounts owed), and in
     exchange it saved the resources required to undertake such litigation and the risk that the court

26   might grant a less favorable award.

ORDER
PAGE - 27

1        As for the State's claim that it is entitled to $306.78 in costs as the prevailing party on

2   appeal, the Court concludes that this determination is best left for the conclusion of these

3   proceedings. Federal Rule of Appellate Procedure 39(a)(3) provides that generally "if a

4   judgment is reversed, costs are taxed against the appellee." However, this rule only applies

5   "unless . . . the court orders otherwise." FED. R. APP. P. 39(a)(3). Given the small amount of

6   funds at issue and the ongoing debate as to whether Plaintiffs would be able to recover their

7   fees and costs from this appeal if they ultimately succeed on their as-applied challenge

8   (*compare* Mot. to Recover Fees 7 (Dkt. No. 130), *with* Rep. Resp. to Mot. to Recover Fees 9

9   (Dkt. No. 148)), the Court concludes that an award of costs at this juncture would be

10   inappropriate.

11  **III.**    **CONCLUSION**

12       For the foregoing reasons, the State's Motion to Dismiss (Dkt. No. 133) and Grange's

13   Motion to Dismiss (Dkt. No. 134) are DENIED as to Plaintiffs' as-applied forced association

14   claims but GRANTED as to each of Plaintiffs' other claims.

15        The Democratic Party's Motion to Amend and Supplement Complaint (Dkt. No. 137)

16   and the Republican Party's Motion for Leave to File Supplemental and Amended Complaint

17   (Dkt. No. 140) are GRANTED as to amendments necessary and related to the ongoing as-

18   applied challenge but DENIED as to Plaintiffs' proposed state constitutional law claims.

19        The State's Motion to Recover Attorney Fees and for Costs (Dkt. No. 130) is

20   GRANTED as to the recovery of previously paid attorneys' fees and costs but DENIED as to

21   reimbursement for the State's costs.

22   //

23   //

24   //

25   //

26   //

ORDER
PAGE - 28

1     DATED this 20th day of August, 2009.

2

3

4

5                        John C. Coughenour
United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER
PAGE - 29

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **EXHIBIT D**

INTERVENERS' REQUEST FOR JUDICIAL NOTICE IN                    CASE NO.  2:12-cv-05547-PA-SPx
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION                                **EXHIBIT D**

<u>**California Presidential Primary Election**</u>

**Semi-Official Election Results**

## U.S. Congress District 8 - Districtwide Results

★ ★ **Close Contest** (/returns/close-contests/) ★ ★
100.0% ( 870 of 870 ) precincts partially
or fully reporting as of June 26, 2012, 4:47 p.m. ❷ (/frequently-asked-questions/#faq-reporting)
Visit our **County Reporting Status** (/returns/status/) page to determine if a county has submitted a
final election night report.

**Previous District** (/returns/us-congress/district/7/)

**Select a District** (/contests/district/us-congress/)

**Next District** (/returns/us-congress/district/9/)

| Candidate | Votes | Percent |
|---|---|---|
| **Jackie Conaway**<br>(Party Preference: Dem) | 11,674 | 14.3% |
| **John Pinkerton**<br>(Party Preference: Dem) | 7,941 | 9.7% |
| **Dennis L. Albertsen**<br>(Party Preference: Rep) | 761 | 0.9% |
| **Paul Cook**<br>(Party Preference: Rep) | 12,517 | 15.3% |
| **George T. Craig**<br>(Party Preference: Rep) | 1,376 | 1.7% |
| **Gregg Imus**<br>(Party Preference: Rep) | 12,754 | 15.6% |
| **Bill Jensen**<br>(Party Preference: Rep) | 1,850 | 2.3% |
| **Phil Liberatore**<br>(Party Preference: Rep) | 12,277 | 15.0% |
| **Ryan McEachron**<br>(Party Preference: Rep) | 3,181 | 3.9% |
| **Brad Mitzelfelt**<br>(Party Preference: Rep) | 8,801 | 10.8% |
| **Joseph D. Napolitano**<br>(Party Preference: Rep) | 1,050 | 1.3% |
| **Angela Valles**<br>(Party Preference: Rep) | 4,924 | 6.0% |
| **Anthony Adams**<br>(Party Preference: NPP) | 2,750 | 3.4% |

**PROOF OF SERVICE**

I am employed in the County of Marin, State of California. I am over the age of 18 and not a party to the within cause of action. My business address is, 2350 Kerner Boulevard, Suite 250, San Rafael, California 94901.

On July 6, 2012, I caused the foregoing document described as **INTERVENERS' REQUEST FOR JUDICIAL NOTICE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIIMINARY INJUNCITON** to be served on the individuals listed below as follows:

| | |
|---|---|
| Robert D. Conaway, Esq.<br>Law Office of Robert D. Conaway<br>222 E. Main Street, Suite 212<br>Mailing Address: P.O. Box 865<br>Barstow, CA 923120865<br>Ph: (760) 256-0603<br>Email: rdconaway@gmail.com<br>(Attorney for Plaintiff) | George Waters, Esq.<br>Deputy Attorney General<br>Office of the Attorney General<br>1300 I St., Suite 125<br>Sacramento, CA 94244-2550<br>Ph: (916) 323-8050<br>Email: George.Waters@doj.ca.gov<br>(Attorney for Defendant Debra Bowen) |

__x__   **BY U.S. MAIL:** By following ordinary business practices and placing for collection and mailing at 2350 Kerner Blvd., Suite 250, San Rafael, California 94901 a true copy of the above-referenced document(s), enclosed in a sealed envelope; in the ordinary course of business, the above documents would have been deposited for first-class delivery with the United States Postal Service the same day they were placed for deposit, with postage thereon fully prepaid.

__x__   **BY ELECTRONIC SERVICE:** By transmitting by email to the above party(ies) at the above email addresses.

Executed in San Rafael, California on July 6, 2012. I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct.

_Paula Scott_
_____
Paula A. Scott

| | |
|---|---|
| INTERVENERS' REQUEST FOR JUDICIAL NOTICE IN<br>OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION | CASE NO. 2:12-cv-05547-PA-SPx<br>**PROOF OF SERVICE** |